**Robert WARREN, a minor By and Through Lori ORLANDO, his parent and natural guardian, Plaintiff,**

v.

**READING SCHOOL DISTRICT, Geraldina Sepulveda, in her individual and official capacity as Principal of the 10th and Green Elementary School, and James A. Goodhart, in his individual and official capacity as Superintendent of the Reading School District, Defendants.**

No. Civ.A. 97–4064.

United States District Court,
E.D. Pennsylvania.

Jan. 28, 2000.

Michael D. Dautrich, Reading, PA, for plaintiff.

Fred B. Buck, Rawle & Henderson, Philadelphia, PA, for defendants.

## MEMORANDUM

JOYNER, District Judge.

This action was brought on behalf of plaintiff Robert Warren, alleging claims under Title IX, 20 U.S.C. § 1681, *et seq.*, and other federal and state claims. Plaintiff's claims are based on allegations of sexual abuse by Plaintiff's school teacher, Harold Brown. A jury trial was held, and the jury returned a verdict against Reading School District on Plaintiff's Title IX claim, awarding $400,000 in damages. Defendant Reading School District filed a post trial motion for judgment as a matter of law under Fed.R.Civ.P. 50(b) or, in the alternative, for a new trial on the Title IX claim under Fed.R.Civ.P. 59, which is presently before the Court. For the following reasons, Defendant's Motion is denied.

### Background

For the purposes of this Motion the facts will be viewed in the light most favorable to the Plaintiff. In April, 1995, Robert Warren ("Robbie") transferred into the Tenth and Green Elementary School, where he was assigned to Harold Brown's fourth grade classroom. At some point after Robbie's transfer, Mr. Brown asked Robbie to stay after school, locked the classroom door, then asked him to participate in an activity that Mr. Brown called "shoulders." This activity involved Robbie doing squats with his head between Mr. Brown's legs and his shoulders on Mr. Brown's thighs. This took place two or three times per week during the school year. Mr. Brown also drove by Robbie's house over the following summer, picked Robbie up, and took him to a "secret place" near the woods where they again engaged in "shoulders."

In early November, 1995, Robbie's mother discovered Robbie's journal and read an entry in which Robbie described engaging in "shoulders" with Mr. Brown at a secret spot. She spoke to Robbie, then reported the incident to the Berks County Children and Youth Services. Mr. Brown was suspended with pay, and he ultimately resigned his position.

An action was brought against Defendants on behalf of Plaintiff, alleging claims under Title IX, 20 U.S.C. § 1681, *et seq.*, and other federal and state claims. The jury returned a verdict against Defendant Reading School District, awarding $400,000 in damages. Reading School District subsequently filed this Motion for judgment as a matter of law, or in the alternative a new trial.

### Discussion

#### I. MOTION FOR JUDGMENT AS A MATTER OF LAW

A renewed motion for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(b) should only be granted if, "viewing the evidence in the light most favorable to the non-movant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury could reasonably find liability." *Coleman v. Kaye*, 87 F.3d 1491, 1497 (3d Cir.1996) (citations omitted). A mere scintilla of evidence is not enough. *See Walter v. Holiday Inns, Inc.*, 985 F.2d 1232, 1238 (3d Cir.1993). Instead, there must be sufficient "evidence upon which the jury could properly find a verdict for that party." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir.1993) (citations omitted). In making the determination, the Court "may not weigh the evidence, determine credibility of witnesses, or substitute its version of the facts for the jury's version." *Id.*

Defendant's Motion argues that

plaintiff introduced no evidence from which the jury could determine that an official of the Reading School District who, at a minimum, had authority to address alleged discrimination and to institute corrective measures on the School District's behalf had actual knowledge of, and was deliberately indifferent to Harold Brown's conduct.

Defendant's Motion at ¶¶ 1–3. Defendant's argument is based on *Gebser v. Lago Vista Independent School District*, 524 U.S. 274, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998), in which the Supreme Court limited a plaintiff's ability to recover against a school district under Title IX to situations in which "an official of the school district who at a minimum has authority to institute corrective measures on the district's behalf has actual notice of, and is deliberately indifferent to, the teacher's misconduct." *Gebser*, 524 U.S. at 284, 118 S.Ct. 1989.

The Court finds that the jury was presented with sufficient evidence to find that Dr. Sepulveda, the principal at the Tenth and Green Elementary School, had actual notice of, and was deliberately indifferent to Mr. Brown's misconduct. Carlos Mercado, the parent of a boy who had previously been a student in Mr. Brown's classroom, testified that he told Dr. Sepulveda that he "wanted to talk to her about Mr. Brown taking my kid to his house, that there's no reason for him to take him to his house and give money to him to lift him up and down." Dr. Sepulveda apparently walked out, saying that she was in a hurry, but directed Mr. Mercado to speak to the school's guidance counselor, Frank Vecchio. Mr. Mercado did so, repeating his complaint to Mr. Vecchio.

The jury also received evidence from two "supervisory conference" memoranda, in which Mr. Brown was evaluated. The first such memorandum, dated March 12, 1969, stated that "[w]e also discussed his preparation for graduate school—children in his class—and his involvement with children after school hours." The second memorandum, dated October 24, 1995, stated "it has been brought to my attention that the games that you play with the students in the classroom involve physical contact. For the best interest of all concerned, this situation must 'stop'." Dr. Sepulveda testified that this memorandum refers not to inappropriate sexual contact, but rather to a parent's complaint that inappropriate "horseplay" was occurring in Mr. Brown's classroom during recess.

Considering this evidence together, the jury could reasonably have found that Dr. Sepulveda had notice of accusations that Mr. Brown was engaging in inappropriate sexual conduct with students. Taking the evidence chronologically, the 1969 supervisory conference memorandum was surely ambiguous, but may have at least raised the jury's suspicion. Mr. Mercado's conversation with Dr. Sepulveda, then Mr. Vecchio, when combined with this memorandum, may have strengthened that suspicion. Then, in considering the 1995 memorandum, the jury may not have believed Dr. Sepulveda's argument that she was referring to "horseplay" in the classroom during recess when she wrote, "the games you play with the students in the classroom involve physical contact. For the best interest of all concerned, this situation must 'stop'." Although this last memorandum comes a few months after Mr. Brown's contacts with Robbie, the jury may have found it probative, especially when combined with the other evidence in this case, of Dr. Sepulveda's credibility generally, and more specifically what Dr. Sepulveda and the Reading School District knew before Mr. Brown's contacts with Robbie. The 1995 memorandum sheds light on the 1969 memorandum, as well as on Mr. Mercado's conversation with Dr. Sepulveda. Taken together, all of this evidence could lead a reasonably jury to find that Dr. Sepulveda had knowledge of Mr. Brown's behavior.

Defendant contends that even if Dr. Sepulveda had knowledge of Mr. Brown's behavior, as principal of the Tenth and Green Elementary School she is not an official who has authority "to institute corrective measures on the district's behalf" within the meaning of *Gebser*. Defendant acknowledges that Dr. Sepulveda had "supervisory authority over the teachers at the school." Defendant's Memorandum at 10. However, Defendant points to Dr. Sepulveda's testimony that her duty in the face of a claim of sexual misconduct is to "obtain statements from the teachers involved and 'turn the matter over to the

people at the school district administrative building.' " *Id.* Defendant cites to a case in the District of Rhode Island for the proposition that "a duty to report information to appropriate authorities is plainly not an 'authority to take corrective action' because the report itself could not have ended the discrimination.' " *Liu v. Striuli*, 36 F.Supp.2d 452, 466 (D.R.I.1999). However, this quotation is taken somewhat out of context. The full sentence in *Liu* begins "Such a duty . . .", and is preceded by several sentences that both limit the significance of the holding and make it clear that it is inapplicable to this case. The Court in *Liu* is referring not to any duty to report information, but rather just to the type of duty to report that it describes in the preceding sentences. The complete paragraph from which Defendant's quotation is taken is:

> Vicarious liability also cannot be foisted upon the College through D'Arcy's alleged inaction because he is not an official of the College "with authority to take corrective action to end the discrimination." *Gebser*, 118 S.Ct. at 1999. D'Arcy, as Director of Financial Aid, *was not a supervisor of Striuli* nor was he an official who had the authority to police relationships between faculty and doctoral students. *D'Arcy had no power to discipline or even to question Striuli about the relationship.* If, as Liu argues, D'Arcy had a duty under the College's sexual harassment policy to report to the appropriate authority his knowledge of Striuli's relationship with Liu because it may have violated the prohibition on amorous faculty-student liaisons, *this duty was no more than that which every employee of the College had. Such a duty* to report information to appropriate authorities is plainly not an "authority to take corrective action" because the report itself could not have ended the discrimination.

1. Note that the information the principal had received in *Gebser* was only that the teacher in question had made inappropriate comments in class. The principal had received no

*Liu*, 36 F.Supp.2d at 466 (emphasis added). Dr. Sepulveda, unlike the Director of Financial Aid in *Liu*, was a supervisor of Mr. Brown, and certainly had power to question Mr. Brown about the relationship. Further, her duty to respond to complaints of sexual abuse against a teacher, which Defendant compares to the duty in *Liu*, was certainly not "no more than that which every employee of the [School District] had." *Id.* The facts of *Liu* are thus significantly different from the facts in this case.

Although the issue has not been addressed by the Third Circuit, this Court does not believe that the Supreme Court's intention in *Gebser* was to exclude a school principal from the list of authorized people whose non-feasance in the face of an allegation of sexual misconduct can lead to school district liability. The Court in *Gebser* referred to the principal as an "official," and discussed the fact that the information he had received was "insufficient to alert the principal to the possibility that [the offending teacher] was involved in a sexual relationship with a teacher." *Gebser*, 524 U.S. at 292, 118 S.Ct. 1989.[1] This discussion would not have been necessary if the principal's actual knowledge would not have satisfied the standard set out by the Court.

Judge Bechtle of this District addressed a similar Title IX case in *Miller v. Kentosh*, 1998 WL 355520 (E.D.Pa.). He dismissed the claims against the school district on summary judgment, concentrating much of his discussion on whether the principal in that case had actual knowledge of the teacher's misconduct, without any discussion of the particular duties and responsibilities of the principal in that case. *Miller*, 1998 WL 355520 at \*6. Judge Bechtle thus seems to have agreed that a school principal is generally an appropriate official under *Gebser*, as otherwise the discussion of the principal's knowledge would have been unnecessary. In *Canty v. Old*

hint of inappropriate physical contact with students. *See Gebser*, 524 U.S. at 284, 118 S.Ct. 1989.

*Rochester Regional Sch. Dist.*, 66 F.Supp.2d 114 (D.Mass.1999), a similar case in another district, the Court denied summary judgment in part because the principal in that case privately acknowledged to parents that he believed the allegations of sexual misconduct. The Court in *Canty* treated the principal's admission as satisfying the *Gebser* requirement. *Id.* at 116–17.

Thus, in light of the Supreme Court's reasoning in *Gebser*, the cases discussed above, and the particular facts of this case, this Court finds that Dr. Sepulveda is an official with authority "to institute corrective measures on the district's behalf" within the meaning of *Gebser*, and therefore rejects Defendant's contention that the jury's verdict was wrong as a matter of law.

## II. MOTION FOR NEW TRIAL

■ Under Fed.R.Civ.P. 59, the standard for granting a new trial is if "the verdict is contrary to the great weight of the evidence or errors at trial produce a result inconsistent with substantial justice." *Sandrow v. United States*, 832 F.Supp. 918 (E.D.Pa.1993) (citations omitted). A new trial should only be granted "where a miscarriage of justice would result if the verdict were to stand." *Olefins Trading, Inc. v. Han Yang Chemical Corp.*, 9 F.3d 282, 289 (3d Cir.1993).

Defendant's motion first argues that the jury's verdict is against the weight of the evidence, for the same reasons that it argued a judgment as a matter of law was appropriate in this case. "[N]ew trials because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Williamson v. Consol. Rail Corp*, 926 F.2d 1344, 1353 (3d Cir.1991). As discussed in Section One (I) above, the Court does not agree that the jury's verdict is against the weight of the evidence, let alone that it shocks our conscience or resulted in a miscarriage of justice.

■ The remainder of Defendant's arguments for a new trial consist of arguments that the Court erred in previous rulings. Defendant argues that the Court erred by not granting a mistrial after Plaintiff's counsel read to the jury a portion of a deposition transcript in which a witness affirmed that he was "aware of any prior incidents at the Reading School District of sexual abuse by teachers against students." The Court responded with the following instruction:

> THE COURT: Members of the jury, the last portion of the deposition testimony that was read to you is stricken. You are to totally disregard that portion of the testimony that has been read to you. You are not to consider that in any way, shape, form, or manner during the course of your deliberations.
>
> If you cannot, you can let me know now. Do you understand my instructions to you, members of the jury?
>
> A JUROR: Yes.

The test for whether a mistrial is appropriate when improper remarks are made to a jury is "whether the improper assertions have made it 'reasonably probable' that the verdict was influenced by prejudicial statements." *Fineman v. Armstrong World Indus.*, 980 F.2d 171, 207 (3d Cir.1992) (citation omitted). In light of the Court's curative instruction, the improper evidence read by Plaintiff's attorney did not make it reasonably probable that the verdict would be influenced by prejudicial statements, so a mistrial was not appropriate on this basis. The Court stands by its previous ruling.

■ Defendant also argues that the Court erred in denying Defendant's Motion *In Limine* to preclude the expert testimony of Chester Kent. Defendant puts forward four arguments for the exclusion of Dr. Kent's testimony: (1) that Dr. Kent's testimony does not assist the trier of fact to understand the evidence or determine a fact in issue; (2) that Dr. Kent's expert opinion was predicated upon the incorrect legal standard under 42 U.S.C.

§ 1983; (3) that in forming his opinion Dr. Kent relied upon evidence that is either inadmissible or not reasonably relied upon by experts in his field; and (4) that the prejudicial effect of Dr. Kent's testimony far outweighs its probative value. With regard to the first argument, Fed.R.Evid. 702 requires that expert testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue." Dr. Kent, whose qualification as an expert Defendant's Memorandum does not question, assisted the jury with understanding administrative policy and procedure in schools. Defendant argues that "[t]he clear thrust of Dr. Kent's testimony was to question the credibility of Dr. Sepulveda and other School District employees by imputing motives and knowledge for which there was no evidence." The Court disagrees: the thrust of Dr. Kent's testimony was to assist the jury with understanding administrative policy and procedure in schools. The jury may or may not have drawn inferences about the credibility of Dr. Sepulveda and other witnesses on the basis of Dr. Kent's testimony, but there is nothing wrong with that. Indeed, that is part of the jury's job. Dr. Kent is qualified as an expert, and his testimony was proper.

The Court sees nothing to support Defendant's other arguments that Dr. Kent's testimony was inappropriate, and Defendant's memorandum points to nothing in the record that supports these arguments. Accordingly, the Court stands by its previous ruling denying Defendant's Motion *In Limine* to preclude the expert testimony of Chester Kent.

Defendant next argues that the Court erred when it declined to instruct the jury that Mr. Vecchio, a guidance counselor, was not an "official" of the Reading School District within the meaning of *Gebser*, 524 U.S. at 284, 118 S.Ct. 1989. The Court does not agree with Defendant that it is clear that Mr. Vecchio was not an appropriate official under *Gebser* when the principal, Dr. Sepulveda, had transferred her authority to Mr. Vecchio. But more importantly, even if Mr. Vecchio were not an

appropriate official under *Gebser*, for the reasons discussed in Section One (I) above the jury's verdict would not be "contrary to the great weight of the evidence," nor would the jury's verdict "produce a result inconsistent with substantial justice." *Sandrow*, 832 F.Supp. at 918. Therefore, Defendant's request for a new trial on this basis is denied.

▄▄ Finally, Defendant argues that the Court erred in denying Defendant's Motion *In Limine* to preclude the March 12, 1969 supervisory conference memorandum. Defendant argues that "there was nothing in the language of the supervisory conference memorandum which established that it pertained to improper physical contact between Mr. Brown and any of his students." The document in question stated, in part, "[w]e also discussed his preparation for graduate school—children in his class—and his involvement with children after school hours."

If the document in question really contained nothing relevant to improper contact between Mr. Brown and any of his students, it is unclear why Defendant would find the document objectionable, or how it could possibly cause unfair prejudice. Indeed, the Court finds that the document, combined with other evidence presented to the jury in this case, was probative of whether the Reading School District knew of Mr. Brown's inappropriate activities with his male students. Defendant further argues that "[e]ven if relevant, [the document's] prejudicial effect outweighed its probative value and it should have been precluded on that basis." The document may have been prejudicial, as all good evidence is, but if so it was not unfairly prejudicial. If the probative value of evidence were to be weighed against its prejudicial value, only mediocre evidence (e.g. relevant but not too prejudicial) would be allowed. Instead, Fed.R.Evid. 403 requires a balancing of probative value with "the danger of *unfair* prejudice." Fed. R.Evid. 403 (emphasis added). If the jury drew an inference from the March 12, 1969

supervisory memorandum, the Court does not see how this inference was unfair. Defendant's request for a new trial on this basis is therefore denied.

## CONCLUSION

Dr. Geraldina Sepulveda, the principal of the Tenth and Green Elementary School, is an official with authority "to institute corrective measures on the district's behalf" within the meaning of *Gebser*, 524 U.S. at 284, 118 S.Ct. 1989. Thus, there was sufficient evidence for the jury to find against the Reading School District in this case, and Defendant's motion for judgment as a matter of law is denied. The Court finds that it did not err in its rulings: (1) denying Defendant's motion for a mistrial after plaintiff's counsel read inadmissible testimony to the jury; (2) allowing the expert testimony of Dr. Kent; (3) not instructing the jury that guidance counselor Mr. Vicchio was not an appropriate official within the meaning of *Gebser*; and (4) allowing admission of the March 12, 1969 supervisory conference memorandum. Further, the Court does not agree that the verdict is against the weight of the evidence. Therefore, Defendant's motion for a new trial is denied.

An appropriate Order follows.